UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

VIVIAN A. OUTLEY

　　　　　　　Plaintiff,

　　　　v.　　　　　　　　　　　　　**REPORT AND RECOMMENDATION**
　　　　　　　　　　　　　　　　　　　**5:09-CV-0141 (FJS/VEB)**

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,

　　　　　　　Defendant.

## I.　Introduction

In February of 2005, Plaintiff Vivian Outley filed an application for Supplemental Security Income ("SSI") benefits under the Social Security Act. Plaintiff alleges she has been unable to work since January 25, 2003, due to arthritis, knee replacement, back impairment, depression, schizophrenia, anxiety, and posttraumatic stress disorder. The Commissioner of Social Security ("Commissioner") denied Plaintiff's application.

Plaintiff, through her attorneys, Legal Services of Central New York, Christopher Cadin, Esq., of counsel, commenced this action on February 5, 2009, by filing a Complaint in the United States District Court for the Northern District of New York. (Docket No. 1). Plaintiff seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

On December 17, 2009, the Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 17).

## II.    Background

The relevant procedural history may be summarized as follows: Plaintiff initially applied for SSI benefits on February 17, 2005, alleging disability beginning on January 25, 2003 (R. at 24, 48).[1] Plaintiff alleged disability due to arthritis, knee replacement, back impairment, depression, schizophrenia, anxiety, and posttraumatic stress disorder. The application was denied (R. at 25-27). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") (R. at 28). A hearing was held in Syracuse, New York, on September 7, 2007, before ALJ Brounoff (R. at 472). Plaintiff, represented by counsel, appeared and testified (R. at 472). On November 30, 2007, ALJ Brounoff issued a decision finding Plaintiff not disabled (R. at 13-23). Plaintiff filed a request for review of that decision (R. at 12). The ALJ's decision became the Commissioner's final decision on December 19, 2008, when the Appeals Council denied Plaintiff's request for review (R. at 5-9).

Plaintiff, through counsel, timely commenced this action on February 5, 2009. (Docket No. 1). The Commissioner interposed an Answer on May 21, 2009. (Docket No. 8). Plaintiff filed a supporting Brief on September 8, 2009. (Docket No. 13). The Commissioner filed a Brief in opposition on October 15, 2009. (Docket No. 16).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

For the reasons that follow, it is recommended that the Commissioner's motion be denied, Plaintiff's motion be granted, and that this case be remanded for further

---

[1] Citations to "R" refer to the Administrative Transcript. (Docket No. 7).

proceedings.

### III.    Discussion

### A.  Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258

3

(2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process[2] to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry

---

[2] The five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

### B. Analysis

#### 1.    The Commissioner's Decision

The ALJ followed the sequential analysis and concluded that Plaintiff was not disabled within the meaning of the Act. (R. at 16). At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 7, 2005, her protective filing date (R. at 18).

At step two, the ALJ concluded that Plaintiff had the following severe impairments: "symptoms status post left total knee replacement, lateral meniscus tear and lateral collateral ligament tear of the right knee, lumbar degenerative disc disease at L5-S1 with impingement of the left L5 nerve root, depression, anxiety, and paranoid schizophrenia" (R. at 18). The ALJ also found that Plaintiff's gastroesophageal reflux disease, asthma, and diagnoses to "rule out" schizoaffective disorder and posttraumatic stress disorder were not severe impairments within the meaning of the regulations (R. at 18).

At step three, the ALJ found that Plaintiff's impairments, individually or in combination, did not meet an impairment set forth in the Listings (R. at 19). At step four, the ALJ considered Plaintiff's subjective complaints of pain and other symptoms, but

found her "not fully credible" (R. at 21).

The ALJ also considered the medical opinions of record and granted limited weight to the opinions of Plaintiff's treating psychiatrist, Jean D'Souza, M.D. and "greater weight" to the opinions of consultative examining psychologist, Kristen Barry, Ph.D. (R. at 20). The ALJ also considered, but did not explicitly weigh, the opinions and findings of consultative examining physician Kalyani Ganesh, M.D., state agency disability analyst J. Shelp, Plaintiff's psychologist Paula Trief, Ph.D., and consultative reviewing psychiatrist Zenaida Mata, M.D. (R. at 20).

Based on these conclusions, that ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift, carry, push or pull ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours in a workday, sit for six hours a day, and only occasionally climb, balance, stoop, kneel, crouch, or crawl (R. at 19). Further, the ALJ found Plaintiff was "limited to low stress work, defined as work that does not require working at a production pace, does not involve supervisory responsibilities, does not require multi-tasking, and does not requires the ability to make more than simple decisions," but still capable of the mental demands of unskilled work (R. at 19, 22).

The ALJ then concluded Plaintiff could not perform her past relevant work (R. at 21-22). At step five, considering Plaintiff's RFC and the testimony of vocational expert ("VE") Victor Alberigi, the ALJ found that there were jobs in the national economy that Plaintiff could perform, such as weight tester/inspector, waxer/grinder or polisher, and stone setter (R. at 22). Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (R. at 23).

6

**2.      Plaintiff's Claims**

Plaintiff argues that (a) the ALJ's physical RFC determination was unsupported by substantial evidence; (b) the ALJ erred in failing to give controlling weight to Plaintiff's treating psychiatrist's opinions, resulting in an incomplete mental RFC determination; (c) the ALJ's credibility analysis was unsupported by substantial evidence; and (d) the ALJ's step five analysis was necessarily flawed. Plaintiff's Brief, pp. 18-30.

**a.  The ALJ's Physical RFC Determination is Unsupported**

The  ALJ determined that Plaintiff had the physical RFC to lift, carry, push or pull ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours in a workday, sit for six hours a day, and only occasionally climb, balance, stoop, kneel, crouch, or crawl (R. at 19). The ALJ based this determination on the opinions of consultative physical examining physician (Dr. Ganesh) and an RFC form completed by a disability analyst (J. Shelp). (R. at 21,165-69, 175-80). After carefully reviewing the record, the Court concludes that the ALJ's physical RFC determination is unsupported by substantial evidence for two reasons.

First, the physical portion of the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to fully develop the record. Notably absent from this record are medical source statements ("MSS") from any of Plaintiff's treating sources regarding Plaintiff's physical abilities. See Social Security Ruling, 96-5p, 1996 WL 374183, at *4 (S.S.A.) (hereinafter SSR 96-5p) (defining an MSS is "a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings.") (quoting 20 C.F.R. §§

7

404.1513(b)(6); 416.913(b)(6)).

The Commissioner should request an MSS from the claimant's treating physician if such a statement has not been provided. See 20 C.F.R. § 416.912(d) (explaining that the Commissioner will "make every reasonable effort to help you get medical reports from your own medical sources"); 20 C.F.R. § 416.913(b) (explaining that a medical report should include an MSS); 20 C.F.R. § 416.912(e)(1) (requiring the Commissioner to recontact a treating source if the medical report "does not contain all the necessary information"); see, e.g., Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y.1991) (noting that an ALJ must "make every reasonable effort to obtain . . . a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability").

In this case, Plaintiff had several treating orthopedic surgeons for her knee impairments: Dr. John P. Cannizzaro, M.D., Dr. Michael T. Clarke, M.D., and Dr. Andrew Grose, M.D., as well as a general treating physician who followed her back impairment and knee impairments: Jennie Brown, M.D. (R. at 100-25, 325-72, 388-91, 411-40). None of these treating sources provided a medical report indicating Plaintiff's ability to function physically despite her impairments.[3] Even the ALJ noted this discrepancy when at the end of Plaintiff's hearing he said to her representative, "You've got 10 days, get me back a medical source statement from Dr. B[rown] . . . physical" (R. at 515-16). Nonetheless, the ALJ made no attempt to obtain the necessary information himself.

---

[3] The Court acknowledges that Dr. Clarke and Dr. Brown completed check-off forms for a State agency indicating Plaintiff could not participate in work-preparation activities, however, these do not constitute medical reports nor do they indicate the doctors' opinions as to Plaintiff's ability to function despite her impairments (R. at 249, 252-53, 269).

In these circumstances, the ALJ had an affirmative duty to fully and fairly develop the record, *sua sponte*, even though Plaintiff was represented. <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996); <u>see also</u> 20 C.F.R. § 416.912(e)(1). The ALJ's failure to develop the record by seeking the opinions of Plaintiff's treating sources necessitates remand. <u>See</u> <u>Dickson v. Astrue</u>, No. 1:06-CV-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (finding remand necessary if the ALJ failed to make reasonable efforts to obtain an assessment of Plaintiff's functioning from her treating physician); <u>Lawton v. Astrue</u>, 2009 WL 2867905, at *16 (N.D.N.Y. Sept. 2, 2009) (internal citations removed) ("The ALJ's failure to re-contact [plaintiff's treating physician] in an attempt to obtain an RFC or medical source statement constitutes a breach of the ALJ's duty to develop the record, and provides a basis for remand.").

Second, the physical RFC determination is further unsupported by substantial evidence because the record establishes that the evidence the ALJ relied upon pre-dated Plaintiff's recovery from total knee replacement surgery and other probative medical evidence. <u>Richardson</u>, 402 U.S. at 401 (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). More specifically, the record establishes that on April 4, 2005, Dr. Clarke performed a left total knee replacement on Plaintiff and that as of April 18, 2005, Plaintiff was ambulating with a walker (R. at 337, 388-91). Shortly thereafter, on April 27, 2005, Dr. Ganesh examined Plaintiff, noting that she was in the "acute post-operative phase" (R. at 165-69). In light of her condition, Dr. Ganesh opined that Plaintiff had a "moderate" limitation to sitting and "severe" limitations to standing, walking, and climbing

and required the use of a cane (R. at 168).[4] On May 16, 2005, disability analyst, J. Shelp completed a physical RFC form, relying primarily upon Dr. Ganesh's examination (R. at 175-80). Plaintiff struggled in physical therapy, and by June 29, 2005 was readmitted to the hospital for manipulation of her left knee under anesthesia because she had not adequately regained motion in her knee (R. at 262, 335-36, 381-86).

The timing of Dr. Ganesh's examination makes his opinion and the disability analyst's resulting RFC form unlikely to reflect Plaintiff's physical functioning beyond what Dr. Ganesh called the "acute post-operative phase." (R. at 166). The ALJ obliquely acknowledged the inherent deficiencies of this evidence when he evaluated Dr. Ganesh's opinion, stating: "the claimant was in the early post-operative period from her total knee replacement when this examination took place. Thus, it is reasonable to assume that her functioning has improved" (R. at 19). However, this "assumption" by the ALJ is not grounded in actual evidence and, thus, cannot be sustained. The ALJ is not a medical professional and it was inappropriate for him to speculate as to the course of Plaintiff's post-operative process. See 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.912(b)(1)-(6) (defining evidence); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

---

[4] The Court notes that the ALJ did not state what weight he gave to Dr. Ganesh's opinions, but the ALJ did say that he based the RFC, in part, on Dr. Ganesh's opinions (R. at 19, 21). However, from the ALJ's language in assessing Dr. Ganesh's opinions and the differences between Dr. Ganesh's opinion and the ALJ's RFC determination, it is clear to the Court that the ALJ did not fully accept Dr. Ganesh's opinions. See (R. at 19, 165-69). While the ALJ is "not bound by findings made by State agency or other program physicians and psychologists, . . . [he]  must explain the weight given to the opinions in [his] decision[]." Social Security Ruling 96-6p, 1996 WL 374180, at *2 (S.S.A. 1996). Therefore, on remand, the ALJ should clearly explain the weight given to the consultative examiner's opinion. This mandate also applies to the opinions of State agency psychiatrist, Zenaida Mata, M.D., who reviewed Plaintiff's record and provided an opinion, which was not explicitly weighed in the ALJ's decision.

substantial *evidence*, shall be conclusive . . .") (emphasis added).

In light of the timeline presented in the record, Dr. Ganesh's opinion and the disability analyst's form do not constitute substantial evidence. See Huhta v. Barnhart, 328 F.Supp.2d 377, 386 (W.D.N.Y. 2004) (finding error where the ALJ relied on a non-examining physician's opinion formulated before a substantial deterioration in the claimant's condition and before further medical evidence and opinions were generated); Vasquez v. Sec'y of Health & Human Servs., 632 F. Supp. 1560, 1565 (S.D.N.Y. 1986) (noting that non-examining physician's opinions were not substantially contradictory evidence were they pre-dated treatment by the treating physician).

Indeed, there is evidence in the record that Plaintiff's condition deteriorated following Dr. Ganesh's examination. For example, Plaintiff fell through a vent on November 24, 2006, resulting in further injury to her right knee (R. at 266-67, 286, 303, 305, 326). An MRI of that knee on March 21, 2007, showed a complex lateral meniscus tear and chronic collateral ligament tear (R. at 374-75). The ALJ acknowledged as much when he found that Plaintiff's "lateral meniscus tear and lateral collateral ligament tear of the right knee" was a severe impairment (R. at 18). However, it is less than clear that the ALJ actually considered this impairment in assessing Plaintiff's physical functioning at step four.

Therefore, as discussed herein, the Court concludes that the ALJ's physical RFC determination is flawed because the ALJ failed to properly develop the record by attempting to obtain medical source statements from Plaintiff's treating physicians and because the ALJ improperly relied on evidence with little probative value. On remand the ALJ must properly develop the record and reconsider Plaintiff's RFC in light of all

11

the relevant evidence of record.

### b.  The ALJ's Mental RFC Determination is Also Flawed

Plaintiff further argues that the mental portion of the ALJ's RFC determination is incomplete because the ALJ improperly failed to give controlling weight to the opinions of Plaintiff's treating psychiatrist, Dr. D'Souza. Plaintiff's Brief, pp. 27-28.

On August 29, 2007, Dr. Jean D'Souza completed a Mental Health Report, assessing Plaintiff's mental functioning (R. at 404-10). Therein, Dr. D'Souza opined that Plaintiff had "no useful ability to function" in the areas of following work rules, relating to co-workers, dealing with the public, and dealing with work stress (R. at 406). Dr. D'Souza opined Plaintiff was seriously limited but not precluded in her ability to behave in an emotionally stable manner and relate predictably in social situations (R. at 407). Additionally, Dr. D'Souza indicated Plaintiff had limited but satisfactory abilities to use judgment, interact with supervisors, function independently, maintain attention and concentration, maintain personal appearance, demonstrate reliability, and understand, remember and carry out complex, simple and detailed instructions (R. at 406-07). Dr. D'Souza also stated that Plaintiff "has limited ability to function independently on her own" (R. at 407).

The ALJ considered Dr. D'Souza's assessment but gave her opinions "limited weight because [the opinions] [we]re not well supported by information contained in the mental health progress notes of record" (R. at 20). The ALJ reasoned that "on August 20, 2004 it was noted that the claimant's depression had improved"; that on "June 27, 2006, the claimant reported that she was doing fine and had a stable mood . . . denied any acute psychosis, and stated she was socializing with friends and family"; and that

12

on September 7, 2006, she reported her medications working well (R. at 20). The ALJ concluded that "[i]n light of this inconsistency between Dr. D'Souza's functional assessments and the mental health progress notes, I have given greater weight to the opinion of Dr. Barry, the opinion of the State Agency medical consultant, and the aforementioned GAF scores of 60 in assessing the claimant's mental limitation" (R. at 20).

As an initial matter the Court notes that in light of the recommendation for remand to further develop the record, the ALJ must necessarily reconsider his entire RFC determination. Nonetheless, the Court also notes that the regulations explicitly require an ALJ to re-contact a claimant's treating source "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. 416.912(e)(1).

When the ALJ reasoned that Dr. D'Souza's opinions seemed inconsistent with her progress notes, he fell squarely in the purview of the regulations requiring him to seek clarification from Dr. D'Souza. See 20 C.F.R. § 404.1512(e) (stating that the ALJ "will need additional information" "when the evidence . . . from [a claimant's] treating physician . . . is inadequate"); see e.g., Rosa, 168 F.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."); see generally Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (explaining that an ALJ has an affirmative duty to fully and fairly develop the record *sua sponte*, even when a claimant is represented by counsel.).

Moreover, progress notes indicating that Plaintiff's mental condition had "improved" or that her medications were "working well" are not necessarily inconsistent with Dr. D'Souza's overall findings.   These statements generally concern Plaintiff's relative well-being as opposed to her overall capacity.   In other words, Plaintiff might simply have been "improved" from more severe limitations and her medications may be "working well" at maintaining her mental health at a consistent, albeit limited, level. Thus, these statements do not necessarily contradict Dr. D'Souza's assessment in the manner suggested by the ALJ.

Again, the ALJ's decision showed some awareness of the need to develop the record when he stated: "The record was held open after the hearing to allow the claimant's representative an opportunity to obtain and submit additional evidence, including evidence buttressing the opinion of Dr. Souza. However, no new evidence has been submitted" (R. at 21). On remand, if the ALJ continues to maintain that Dr. D'Souza's conclusions ambiguous, he must attempt to clarify her opinions by re-contacting her. With respect to Plaintiff's argument that the mental portion of the RFC determination is incomplete, the Court notes that the ALJ must reconsider such findings on remand.

### c.  The ALJ Must Reconsider Credibility

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial

14

evidence." <u>Lewis v. Apfel</u>, 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (internal citations omitted).

Here, the ALJ considered Plaintiff's subjective complaints of "paranoia, auditory hallucinations ("hearing voices"), anxiety, pain and weakness in both knees, back pain, and stomach pain" (R. at 21). The ALJ found that Plaintiff had "medically determinable impairments that are reasonably capable of causing her subjective symptoms. However, considering the record as a whole, her subjective complaints of disability are not fully credible" (R. at 21). In reaching this conclusion, the ALJ reasoned as follows:

> The record shows that the claimant can prepare meals, do housecleaning and laundry, and shop for groceries (Exhibit 4E). Medical records from April 5, 2006 state that the claimant is active in her church (Exhibit 9F, page 24). These activities are inconsistent with total disability. The claimant has received conservative treatment for back pain, rather than surgery. On February 23, 2005, it was noted that the claimant was capable of walking up a flight of stairs despite her knee problems (Exhibit 2F, page 5). The claimant's knee surgeon has raised questions about the claimant's dedication to physical therapy (Exhibit 21F, pages 7 and 10). On February 2, 2006, the claimant admitted that she had not been doing any knee exercises (Exhibit 21F, page 5). Mental health progress notes indicate that the claimant's mental impairments are under reasonable control with treatments, and these notes do not support the claimant's testimony that she hears voices on a regular basis (Exhibits 9F, 18F, and 19F). On December 21, 2006, the claimant did not report any side effects from her medication (Exhibit 19F, pages 9-10). The claimant has a poor work history and earning record (Exhibit 3D). The record was held open after the hearing to allow the claimant's representative an opportunity to obtain and submit additional evidence, including evidence buttressing the opinion of Dr. Souza [sic]. However, no new evidence has been submitted. The record also shows that in April 2006 the claimant falsified a prescription for narcotic medication (Exhibit 2F, pages 1, 3, and 4). This illegal act diminishes her credibility. In sum, the claimant's subjective complaints of disability are not fully credible.

(R. at 21).

After carefully reviewing the record, the Court concludes, and describes in detail below, that although substantial evidence supports some of the ALJ's credibility analysis, most of his analysis is unsupported.

Therefore, the Court recommends that on remand the ALJ reconsider Plaintiff's subjective complaints of pain and other symptoms and accept the alleged limitations that can be reasonably found consistent with the medical evidence. See 20 C.F.R. §§ 404.1529(a), 416.929(a) ("We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work."); see Rivera v. Barnhart, 379 F.Supp.2d 599, 606 (S.D.N.Y. 2005) (finding error where, *inter alia*, "the ALJ should have evaluated whether Rivera's complaints were consistent with the medical evidence"); see also Social Security Ruling 96-7p, 1996 WL 374186, at *2 (S.S.A.).

The Court does note that several of the ALJ's credibility findings are supported by substantial evidence in the record. For example, the ALJ reasoned that "[m]ental health progress notes indicate that the claimant's mental impairments are under reasonable control with treatments, and these notes do not support the claimant's testimony that she hears voices on a regular basis" (R. at 21). The ALJ's disbelief in this regard is supported by substantial evidence of record. In her testimony, Plaintiff claimed that she heard voices three times a month or more (R. at 497, 506). However, her treatment notes from Dr. D'Souza and Dr. Tirmazi indicate that with treatment she "rarely" had auditory hallucinations. Dr. Tirmazi counseled and treated Plaintiff from

16

September 13, 2005 through June 27, 2006, but only documented one specific occasion when Plaintiff stated she heard voices (R. at 202-10, 214-19, 222-23, 225-27, 229-31, 276-78). Dr. D'Souza counseled and treated Plaintiff from July 24, 2006 onward but only noted Plaintiff reporting voices on two occasions (R. at 294, 296). Otherwise, Dr. D'Souza noted that Plaintiff "state[d] that she rarely experience[s] any auditory hallucinations now" (R. at 200).

Similarly, the ALJ's reasoning that Plaintiff has a "poor work history" and had falsified a prescription is also supported by substantial evidence of record (R. at 21). Plaintiff's earnings report and work history indicate she worked only sporadically since 1987 (R. at 51, 53-54, 62-69, 81). The record also shows that Plaintiff falsified a prescription for hydrocodone by adding refills that were not authorized (R. at 132, 134-35, 480-81). The ALJ properly considered these facts in assessing Plaintiff's credibility and the record supports his negative conclusions. See Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (directing the ALJ to "weigh[] the objective medical evidence, the claimant's demeanor, other indicia of credibility, as well as any inconsistencies").

However, the ALJ's remaining credibility findings are not supported by substantial evidence. For example, the ALJ found that Plaintiff's abilities to "prepare meals, do housecleaning and laundry, and shop for groceries," were "inconsistent with total disability" (R. at 21). However, "the mere fact that [a Plaintiff] is mobile and able to engage in some light tasks at [her] home does not alone establish that [s]he is able to engage in substantial gainful activity." Lecler v. Barnhart, 2002 WL 31548600, at *7 (S.D.N.Y. Nov. 14, 2002) quoting Gold v. Sec'y of Health, Ed. & Welfare, 463 F.2d 38, 41 n. 6 (2d Cir. 1972)).

Furthermore, the record contains consistent reports that Plaintiff was limited by pain in her knees and back. For example, on February 28, 2005, Plaintiff indicated that she cooked meals for herself daily but "can't stand for a longtime"; cleaned and did laundry, but needed help to mop floors and carry the laundry bag; and went grocery shopping once a month (R. at 21, 72-74). After her left total knee replacement in May 2005, Plaintiff reported to examining physician, Dr. Ganesh that she only cooked once a week and could clean, do laundry, shop, shower, and dress (R. at 166). Plaintiff told examining psychologist, Dr. Barry that she "has been having difficulty keeping up with daily tasks such as cooking, cleaning, and laundry because of her recent knee surgery" (R. at 172). On January 11, 2007, Plaintiff reported to her treating psychiatrist, Dr. Jean D'Souza that her back pain "makes it difficult to do day to day chores" (R. at 284). At her hearing in September of 2007 Plaintiff testified that "[i]t's hard for me to get up and cook, I have to start it and sit back down for a minute and then continue to watch it" (R. at 504). She further testified that her son does the cleaning, helps with the laundry, and sweeps the floors (R. at 504).

In light of this evidence of record, the ALJ's conclusion that Plaintiff's household chores were "inconsistent with total disability" is not supported by substantial evidence in the record because her activities as presented in the record do not show that she is truly capable of working. See Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998) ("Moreover, when a disabled person gamely chooses to endure pain in order to pursue important goals, such as attending church and helping his wife on occasion go shopping for their family, it would be a shame to hold this endurance against him in determining

benefits unless his conduct truly showed that he is capable of working.") (internal citations omitted).

Similarly, the ALJ's reasoning that medical records "from April 5, 2006 state that the claimant is active in her church," while strictly true, ignores the larger pattern in the record, which reveals that Plaintiff's pain and mental illnesses impaired her social functioning (R. at 21).

A review of the record reveals that throughout 2003 Plaintiff complained of pain repeatedly and treating physician, Dr. Lisa Kaufmann, M.D., noted that Plaintiff's mood and affect were severely affected by her pain: "The patient did not even to talk a lot. She is not a very pleasant person. She is very mad about her pain" (R. at 154). By the next month Dr. Kaufmann noted Plaintiff appeared to have chronic depression and "she seems to be socially functioning as well as she ever does, just limited by her pain" (R. at 152).

On May 26, 2004, psychologist, Paula Trief, Ph.D. diagnosed Plaintiff with major depressive disorder, noting she was "currently in an agitated depression" and it was "clear that she was emotionally overwhelmed" (R. at 149). Psychological treatment notes indicate Plaintiff's agitation, emotional control, and anger improved somewhat over the next several months, but she was still irritable and experiencing social stress (R. at 138-47).

On February 28, 2005, in her disability application, Plaintiff reported attending church twice a month and talking on the phone occasionally but noted she "can't be around friends to [sic] long" (R. at 75). On April 27, 2005, Plaintiff told consultative psychologist, Kristen Barry, Ph.D. that she "sometimes gets so agitated that she feels

19

like she wants to hurt other people, so she avoids people" and that "she does not like to be around people lately" (R. at 171). Even her orthopedic surgeon noted that Plaintiff's affect remained flat through November of 2005, affecting her motivation for physical therapy (R. at 331-33, 335). On February 13, 2006, treating psychiatrist, Syed Tirmazi, M.D. continued to report Plaintiff's seclusion and lack of socialization due to her mental illness (R. at 229-31, 276-78). Finally, on April 5, 2006, Plaintiff reported to Dr. Tirmazi that she had begun to attend church regularly, but the record only reports her going to church through June 27, 2006 (R. at 203, 206, 215, 218, 222).

After that date, the record shows that Plaintiff's mental symptoms worsened, in part due to the death of her cousin (R. at 199, 255). Thus, at best, substantial evidence of record supports the conclusion that when Plaintiff's pain and symptoms of mental illness were better controlled she engaged in social interaction, such as regularly attending church. Therefore, although the record supports the ALJ's statement that in April of 2006 Plaintiff was attending church, his implication that Plaintiff's churchgoing was inconsistent with her subjective complaints is not supported by substantial evidence of record.

Furthermore, the ALJ's reasoning with respect to Plaintiff's conservative treatment instead of surgery for her back pain was misplaced and certainly not dispositive of her credibility. An ALJ may consider other treatment a claimant undergoes to relieve symptoms. 20 C.F.R. § 404.1529(c)(3)(v); Latham v. Comm'r of Soc. Sec., 2009 WL 1605414, at *15 (N.D.N.Y. June 5, 2009) (noting that where the claimant did not seek treatment for nearly a year, "[s]uch conservative treatment may properly be considered when assessing credibility"). However, "conservative treatment for pain is

20

not, in and of itself, a sufficient basis for rejecting an applicant's complaints." Rivera v. Barnhart, 2005 WL 3555501, at *9 (W.D.N.Y. Dec. 9, 2005) (citing Sykes v. Apfel, 228 F.3d 259, 266 n. 9 (3d Cir.2000)); Valerio v. Comm'r of Soc. Sec., 2009 WL 2424211, at *15 (E.D.N.Y. Aug. 6, 2009) ("[S]ince "the opinion of the treating physician [is not] to be discounted merely because he has recommended a conservative treatment regimen," neither should a conservative treatment program alone weigh substantially against plaintiff's credibility. In addition, since no evidence exists in the record indicating that hospitalization or surgery were recommended treatment options for plaintiff's alleged condition, that plaintiff did not receive such intervention cannot be dispositive as to her credibility.") (quoting Burgess v. Astrue, 537 F.3d 113, 129 (2d Cir. 2008)).

Instead, an ALJ must also consider other relevant factors such as a claimant's other treatments; the type, dosage, and effectiveness of medications; and any other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(iv)-(vi).

This analysis is notably missing in the ALJ's decision despite ample longitudinal evidence in the record indicating that Plaintiff tried multiple treatments, medications and other measures to relieve her pain. S.S.R. 96-7p, 1996 WL 374186, at *7 ("Persistent attempts by the individual to obtain relief of pain or other symptoms . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms"). For example, the record shows that at various times and with varying degrees of effectiveness Plaintiff was prescribed  Flexeril,[5] hydrocodone, Vicodin, Lortab,[6] Motrin,

---

[5] Flexeril is cyclobenzaprine hydrochloride indicated for use in relieving muscle spasms associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 966 (63rd ed. 2009) [hereinafter PDR].

Neurontin,[7] Naprosyn, Tylenol #3,[8] Bextra,[9] Lyrica,[10] and Lidoderm Patches[11] to relieve her pain (R. at 143, 152-54, 156, 159-60, 330, 336, 371, 415, 421-22, 433, 437).

The ALJ's statement that Plaintiff "did not report any side effects from her medications" is true, but misses the point (R. at 21). The more relevant inquiry is whether the type, dosage and effectiveness of Plaintiff's medications support or contradict her allegations of pain. See 20 C.F.R. § 404.1529(c)(3)(iv).The record also shows that Plaintiff underwent six injections in her back and three injections in her left knee for pain relief (R. at 100-02, 141, 143, 321, 323-24, 346, 359). Additionally, Plaintiff tried a TENS unit more than once and multiple rounds of physical therapy to help relieve her pain (R. at 105, 138, 141, 232-48, 254-62, 330, 327, 336, 371). Ultimately, Plaintiff underwent three separate arthroscopic knee surgeries and a total knee replacement of the left knee in attempting to relieve her knee pain (R. at 106-07, 164, 388-91).

Especially in light of the evidence showing Plaintiff's repeated and persistent attempts to relieve her pain and other symptoms, the Court recommends that the ALJ carefully reconsider Plaintiff's credibility on remand. Even accepting that the Plaintiff was not fully credible because she falsified a prescription, substantial evidence in the record supports many of her allegations of pain. On remand, the ALJ should explain the

---

[6] Lortab and Vicodin are brand names for a preparation of hydrocodone and acetaminophen, indicated for use in the treatment of moderate to moderately severe pain. Id. at 529-33, 3143-44.

[7] Neurontin is a preparation of gabapentin, which is indicated for use in treating nerve pain. Neurontin (Gabapentin), RxList, http://www.rxlist.com/neurontin-drug.htm.

[8] Tylenol #3 is a preparation of acetaminophen and codeine phosphate indicated for use in treating mild to moderately severe pain. PDR at 2427.

[9] Bextra was indicated for use in treating the symptoms of osteoarthritis and rheumatoid arthritis, but is no longer available in the U.S. Bextra (Valdecoxib), RxList, http://www.rxlist.com/bextra-drug.htm.

[10] Lyrica is a preparation of pregabalin, which is indicated for the treatment of neuropathic pain. PDR at 2527.

[11] Lidoderm Patches are adhesive material containing 5% lidocaine, which is applied to the skin and indicated for use in treating nerve pain. Id. at 1114-15.

extent to which Plaintiff's symptoms of pain can be accepted as consistent with the evidence. See Martone, 70 F.Supp.2d at 151 (quoting Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)) (explaining that if an ALJ rejects a Plaintiff's alleged symptoms, he "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.").

### d.  The ALJ's Step Five Analysis is Necessarily Flawed

Finally, Plaintiff argues that due to the errors in the RFC, step five of the sequential analysis is necessarily flawed. Plaintiff's Brief, pp. 28-30. The Court agrees and recommends the ALJ reconsider his step five conclusions on remand.

### 3.       Remand

"Sentence four of Section 405 (g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405 (g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." Kirkland v. Astrue, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008). Remand is similarly appropriate where "there is a reasonable basis for doubt whether the ALJ applied the correct legal principles." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (quoting Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)).

Given the deficiencies in the decision as outlined above, it is recommended that the case be remanded for further proceedings consistent with this Report and

Recommendation.

## IV.    Conclusion

For the foregoing reasons, the Court finds that remand is necessary and warranted. Accordingly, it is respectfully recommended that the Commissioner's decision denying disability benefits be REMANDED for further proceedings in accordance with this recommendation and pursuant to sentence four of 42 U.S.C. Section 405(g).

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


DATED: August 26, 2010
Syracuse, New York

## Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892

F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

Victor E. Bianchini
United States Magistrate Judge


DATED: August 26, 2010
Syracuse, New York